**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5598-12T4
            A-5611-12T4

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

MARCUS ST. CLAIRE WHITE,
a/k/a MARCUS WHITE, MARCUS
ST. CLAIR WHITE, DOT MARCUS
ST. CLAIR and MARCUS ROBERTS,

    Defendant-Appellant.

_____

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

ROBBY R. WILLIS, a/k/a ROBERT
WILLIS and RANDY WILLIS,

    Defendant-Appellant.

_____

        Submitted April 4, 2017 — Decided July 26, 2017

        Before Judges Messano and Espinosa.

        On appeal from the Superior Court of New
        Jersey, Law Division, Burlington County,
        Indictment No. 10-08-0841.

Joseph E. Krakora, Public Defender, attorney for appellant in A-5598-12 (Michael J. Confusione, Designated Counsel, on the brief).

Joseph E. Krakora, Public Defender, attorney for appellant in A-5611-12 (Alison S. Perrone, Designated Counsel, on the brief).

Robert D. Bernardi, Burlington County Prosecutor, attorney for respondent (Lisa Sarnoff Gochman, Legal Assistant, of counsel and on the brief).

Appellant Marcus White filed a pro se supplemental brief.

PER CURIAM

We have consolidated these appeals to issue a single opinion. Following a joint trial, the jury found defendant Robby Willis guilty of first-degree kidnapping, N.J.S.A. 2C:13-1(b)(1); first-degree robbery, N.J.S.A. 2C:15-1(a)(1); first-degree carjacking, N.J.S.A. 2C:15-2(a)(4); three counts of first-degree felony murder, N.J.S.A. 2C:11-3(a)(3); second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b); second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a); and third-degree terroristic threats, N.J.S.A. 2C:12-3(a). The jury found co-defendant Marcus St. Claire White guilty of robbery, carjacking, two counts of felony murder, and unlawful possession of a handgun, but acquitted him of the other counts in the indictment.

After appropriate mergers, the judge sentenced Willis to: life imprisonment, with an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, on the felony murder conviction; a consecutive thirty-year term of imprisonment, with a NERA parole ineligibility period on the kidnapping conviction; a consecutive ten-year term of imprisonment, with a five-year period of parole ineligibility pursuant to the Graves Act, N.J.S.A. 2C:43-6(c), on the weapon possession conviction; and a concurrent twenty-year term of imprisonment, with a NERA period of parole ineligibility on the robbery conviction.

As to White, after appropriate mergers, the judge imposed a life sentence with a NERA period of ineligibility on the felony murder conviction; a concurrent twenty-year term of imprisonment with a NERA period of parole ineligibility on the robbery conviction; and a consecutive ten-year term of imprisonment, with a five-year parole ineligibility period under the Graves Act for the weapon possession conviction.

In A-5611-12, Willis raises the following points for our consideration:

> POINT ONE
>
> THE ADMISSION OF TESTIMONY LINKING DEFENDANT TO THE BLOODS GANG DEPRIVED DEFENDANT OF HIS RIGHT TO A FAIR TRIAL.

POINT TWO

THE PROSECUTOR'S IMPROPER TACTICS IN SUMMATION
DEPRIVED DEFENDANT OF A FAIR TRIAL. (Partially
Raised Below)

POINT THREE

THE TRIAL COURT LACKED TERRITORIAL
JURISDICTION OVER THE ROBBERY, CARJACKING,
TERRORISTIC THREATS, CONSPIRACY AND FELONY
MURDER CHARGES AND NEGLECTED TO CHARGE THE
JURY ON THE ISSUE OF TERRITORIAL JURISDICTION.
(Not Raised Below)

POINT FOUR

THE TRIAL COURT ABUSED ITS DISCRETION IN
SENTENCING DEFENDANT TO A TERM OF LIFE PLUS
40 YEARS WITH 94.25 YEARS OF PAROLE
INELIGIBILITY BECAUSE A PROPER ANALYSIS OF THE
AGGRAVATING FACTORS DOES NOT SUPPORT SUCH A
SENTENCE.

In A-5598-12, White raises the following points:

POINT 1

THE PROSECUTOR'S COMMENTS AND THE TRIAL
COURT'S JURY CHARGES DISTORTED THE LAW OF CO-
CONSPIRATOR LIABILITY, WARRANTING REVERSAL
AND REMAND FOR A NEW TRIAL ON THE ROBBERY,
CARJACKING, AND FELONY MURDER CRIMES OF WHICH
DEFENDANT WAS FOUND GUILTY BELOW.

POINT 2

THE TRIAL COURT ERRED IN DENYING DEFENDANT'S
MOTION FOR ACQUITTAL OR FOR NEW TRIAL.

POINT 3

THE PROSECUTOR WENT BEYOND FAIR COMMENT DURING
SUMMATION, DEPRIVING DEFENDANT OF A FAIR
TRIAL.

POINT 4

UNFAIR OTHER WRONGS EVIDENCE CAUSED AN UNFAIR
TRIAL FOR DEFENDANT.

POINT 5

DEFENDANT'S SENTENCE IS IMPROPER AND
EXCESSIVE.

In a pro se supplemental brief, White argues:

POINT I

THE ADMISSION OF TESTIMONY LINKING DEENDANT
TO THE BLOODS GANG DEPRIVED DEFENDANT OF HIS
RIGHT TO A FAIR TRIAL.

Lastly, pursuant to Rule 2:6-11(d), White filed a letter in which he contends our decision in State v. Gonzalez, 444 N.J. Super. 62 (App. Div.), certif. denied, 226 N.J. 209 (2016), decided after the briefs were filed, requires reversal.

We considered these arguments in light of the record and applicable legal standards. We affirm.

I.

We set forth the testimony adduced at trial to the extent necessary to address defendants' legal arguments.[1]

On September 2, 2009, police discovered the lifeless body of Lyudmilla Bershteyn in a field in Mansfield Township, a short distance from the New Jersey Turnpike. A witness who was jogging nearby told police he saw the woman staggering in the field before she collapsed; another witness described an SUV entering the road from a nearby wooded area at a high rate of speed.

The victim operated a property management company and was last seen earlier in the morning of September 2 after inspecting an apartment in Philadelphia. At the time, she was sitting in her silver 2009 Murano SUV. An autopsy revealed she died from a single contact gunshot wound below her ear.

In the morning of September 3, at approximately 1:30 a.m., Officer Charles Coleman of the Summerton Police Department in South Carolina, stopped a speeding silver Murano with Pennsylvania license plates driven by Laurance. Five other people were inside, including both defendants; Willis's cousin, seventeen-year-old

---

[1] The State adduced much of the same evidence at the separate trial of defendants' co-defendant, Lenroy Laurance, which we summarized in our opinion in that appeal. State v. Laurance, A-3696-11 (App. Div. Apr. 7, 2015), certif. denied, 223 N.J. 283 (2015).

Kareem Harrison; White's girlfriend, eighteen-year-old Shaniqua Williams; and Williams's half-sister, sixteen-year-old Bacquea Thomas. Laurance could not produce a driver's license and, upon producing Bershteyn's registration, he told the officer the SUV belonged to his girlfriend's mother. The officer saw the occupants passing around a bag of snacks, grew suspicious and ordered everyone out of the car.

A subsequent search of the Murano revealed three handguns, including one hidden inside the snack bag, the victim's debit card and other personal items, a portable navigation unit, an EZ-Pass transponder and a New Jersey Turnpike toll ticket. All six individuals were taken into custody and South Carolina authorities confirmed with Philadelphia police that the owner of the car had been reported missing. Local police and members of the Burlington County Prosecutor's Office who arrived in South Carolina questioned the occupants. Both defendants provided statements that were introduced to the jury in redacted form.

Police pieced together events of the days leading up to, and following, the September 2 carjacking of Bershteyn. Williams, Thomas and Harrison testified as State's witnesses at trial. Harrison's testimony was critical to the State's case. He provided eyewitness testimony of Bershteyn's abduction by himself, Laurance and Willis, and her shooting death at Laurance's hand. From the

EZ-Pass transponder and navigational device, the State introduced details of the SUV's location at various points and times, which corroborated much of this testimony and placed the car near the murder site at the time of the shooting.

In his statement, White claimed he was not involved in the abduction of the victim but joined the others thereafter and knew she was in the car. He remained in the SUV as Laurance dragged the victim into the field and shot her with Harrison's gun.

Willis denied any involvement at all and said he checked into an employment and training agency on the morning of September 2, but was sent home without any work. He remained home all day until late in the afternoon, when he and the others left for South Carolina.

The State called a witness from the employment and training agency who testified the program was closed on September 2. The State introduced a letter, written by Willis to Harrison while both were in jail, in which Willis expressed anger at Harrison's "snitching," and told him to blame everything on Laurance.

Defendants neither testified nor produced any witnesses at trial.

A-5598-12T4

II.

Willis contends for the first time on appeal that we should vacate his convictions because the trial court lacked territorial jurisdiction. In a single paragraph, White makes the same claim. These arguments lack sufficient merit to warrant extended discussion. R. 2:11-3(e)(2). We add only the following.

Territorial jurisdiction is a non-material element of an offense, N.J.S.A. 2C:1-14(i), and, as such, the issue is "never submitted to the jury unless there is some factual dispute concerning whether the crime occurred in this State." State v. Denofa, 187 N.J. 24, 41 (2006).

> In any appeal from a conviction in which the defendant did not request a territorial jurisdiction charge, an appellate court first must determine whether the record clearly indicated that the crime's location was at issue. If territorial jurisdiction was not clearly in dispute, then the appellate court must still be satisfied regarding the sufficiency of the evidence. On that issue, the standard of review is "whether, viewing the State's evidence in its entirety, be that evidence direct or circumstantial, and giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find" beyond a reasonable doubt that the crime occurred within the State.
>
> [Id. at 44 (quoting State v. Reyes, 50 N.J. 454, 458-59 (1967)).]

A-5598-12T4

Here, there was no pretrial motion seeking dismissal on jurisdictional grounds, nor did either defense counsel raise the issue with the judge or request any instructions.[2]

Moreover, there was proof beyond a reasonable doubt that all the crimes "occurred" in New Jersey. See N.J.S.A. 2C:1-3(a)(1) ("[A] person may be convicted under the law of this State of an offense committed by his own conduct or the conduct of another for which he is legally accountable if . . . [e]ither the conduct which is an element of the offense or the result which is such an element occurs within this State . . . .") (emphasis added). The elements of robbery and carjacking include conduct that occurs "in the course of committing" other conduct, which includes flight thereafter. See N.J.S.A. 2C:15-1(a)(1); 2C:15-2(a)(4). Similarly, kidnapping requires the unlawful removal or confinement of another "[t]o facilitate commission of any crime or flight thereafter." N.J.S.A. 2C:13-1(b)(1). In short, these crimes were ongoing in New Jersey until the execution-style killing of the victim.

The panel in Laurance's appeal considered the same issue and reached the same result. Laurance, supra, slip op. at 16-21.

_____

[2] Counsel for White objected during the prosecutor's opening statement, when he told the jury that New Jersey was the "right place" for the trial. However, the prosecutor moved on without awaiting a ruling, and the issue never arose again.

While that decision is not binding upon us, when faced with the same issue, "an appellate panel may look to the reasoning of a coordinate panel's opinion in the case of a co-defendant." State v. K.P.S., 221 N.J. 266, 279 (2015). The evidence adduced in this case compels the same legal conclusion reached by our colleagues on the evidence adduced during Laurance's trial.

## III.

During the prosecutor's direct examination of Harrison, the following colloquy occurred:

> [Prosecutor]: So you're back in the car, you're back on the road, tell us any other car stops that you can remember along the way down to South Carolina?
>
> [Harrison]: We stopped at the truck stop to get, I think we got Heinekens.
>
> . . . .
>
> [Prosecutor]: Anything else bought there?
>
> [Harrison]: And the little badge.
>
> [Prosecutor]: Tell us about the badge, please. Who bought the badge?
>
> [Harrison]: [Lenroy Laurance]
>
> [Prosecutor]: What kind of badge was it?
>
> [Harrison]: Like a little fake sheriff badge. Fake sheriff badge.
>
> . . . .

11

> [Prosecutor]: Did [Laurance] say why he wanted a fake sheriff's badge?
>
> [Harrison]: Because he was Blood.
>
> [Prosecutor]: He was what?
>
> [Harrison]: He was Blood.

Willis's counsel immediately objected and, at sidebar, requested a mistrial. The prosecutor responded by saying he was surprised by the testimony. The judge denied the request for a mistrial but offered to provide an appropriate jury instruction. Both defense counsel rejected the judge's offer and the trial proceeded. During deliberations, the jury sent out a note requesting a read back of Harrison's testimony referencing "We Blood" or "We be Blood." Willis's counsel renewed his request for a mistrial, arguing that despite redactions made to eliminate gang references, the jury was contaminated by Harrison's reference to the Bloods.

The judge again denied the request for a mistrial, finding specifically that the prosecutor did not intend to elicit Harrison's statement and never re-emphasized the comment during summation. She ordered the read back of Harrison's testimony as requested by the jury, and immediately thereafter provided the following instructions:

> Now, because you've asked this question, I would like to give you an instruction about how to receive this information as I have done at other points in the trial. And based upon

12

that reference or that information, I want to make sure that it is important you understand that that reference is not something that you may consider at all with regard to your verdict as to Marcus White or Robby Willis . . . .

So in terms of how you receive that information, I do give you that cautionary instruction, especially since that's something that you asked for. . . . So please do not consider that at all in reaching your verdict as to these two defendants . . . Robby Willis . . . and Marcus White.

Neither defense counsel requested any further instruction by the court.

Both defendants argue Harrison's reference to the Bloods street gang was prejudicial and requires reversal. We again disagree.

As the Court has explained:

> [A] trial is not a perfectly scripted and choreographed theatrical presentation; rather, it is an extemporaneous production whose course is often unpredictable given the vagaries of the human condition. Attorneys will sometimes pose inartfully crafted questions, and even the most precise question may bring an unexpected response from a witness. In any trial, "inadmissible evidence frequently, often unavoidably, comes to the attention of the jury."
>
> [State v. Yough, 208 N.J. 385, 397 (2011) (quoting State v. Winter, 96 N.J. 640, 646 (1984)).]

"A curative jury instruction is one method to remedy trial error, and is sometimes required to address testimony that should not have been heard by the jury . . . ." State v. McKinney, 223 N.J. 475, 497 (2015) (citing Verdicchio v. Ricca, 179 N.J. 1, 36 (2004)). The trial court is in the best position to determine whether a curative instruction can neutralize any prejudice or the "extraordinary remedy" of a mistrial is required. Yough, supra, 208 N.J. at 397.

Here, the reference was fleeting, and both defense counsel specifically rejected the judge's invitation to provide an immediate curative charge. In responding to the jury's note, the judge gave a strong curative instruction, which clarified that Harrison's gang reference did not apply to either defendant and could not be used by the jury in considering defendants' guilt.

IV.

While prosecutors are entitled to zealously argue the merits of the State's case, State v. Smith, 212 N.J. 365, 403 (2012), cert. denied, 568 U.S. 1217, 133 S. Ct. 1504, 185 L. Ed. 2d 558 (2013), they occupy a special position in our system of criminal justice. State v. Daniels, 182 N.J. 80, 96 (2004). "A prosecutor must refrain from improper methods that result in a wrongful conviction, and is obligated to use legitimate means to bring

14

about a just conviction." Ibid. (quoting State v. Frost, 158 N.J. 76, 83 (1999)).

Both defendants argue the prosecutor's improper summation comments deprived them of a fair trial. In considering the argument, we examine whether a timely objection was made, whether the remarks were withdrawn, or whether the judge acted promptly and provided appropriate instructions. Smith, supra, 212 N.J. at 403. The prosecutor is permitted to vigorously rebut specific arguments made by defense counsel. State v. R.B., 183 N.J. 308, 329-30 (2005).

"Our task is to consider the fair import of the State's summation in its entirety." State v. Jackson, 211 N.J. 394, 409 (2012) (citation and internal quotation marks omitted). "Whether particular prosecutorial efforts can be tolerated as vigorous advocacy or must be condemned as misconduct is often a difficult determination to make. In every instance, the performance must be evaluated in the context of the entire trial . . . ." State v. Negron, 355 N.J. Super. 556, 576 (App. Div. 2002). Finally, even if the prosecutor exceeds the bounds of proper conduct, "[a] finding of prosecutorial misconduct does not end a reviewing court's inquiry because, in order to justify reversal, the misconduct must have been 'so egregious that it deprived the

defendant of a fair trial.'" State v. Smith, 167 N.J. 158, 181 (2001) (quoting Frost, supra, 158 N.J. at 83).

It suffices to say that in summation, both defense counsel launched blistering attacks upon the credibility of Harrison and Williams. Counsel for White emphasized that her client was not present when the victim was abducted, and the State's case rested solely on the testimony of Harrison and Williams, both of whom had reasons to lie. Counsel for Willis called Harrison a "liar," a "schemer," a "career criminal," and a "drug addict" who would do or say anything to get what he wanted.

In response to White's counsel's arguments, the prosecutor said:

> <u>You've been consistently urged by the defense to consider issues that are legally totally, totally irrelevant and have no bearing under the law.</u> For example, . . . Marcus White wasn't there in the beginning. He didn't participate in kidnapping her. Of course, [counsel] doesn't even address the law about a co-conspirator that joins in . . . . Marcus White never touched her. He didn't say anything to her. How could he be guilty. Cause that's not the law. That's why. <u>So if you misapply the law, we will get an unjust result here</u>.

> [(Emphasis added).]

There was no objection to the prosecutor's comment.

In discussing Willis's counsel's cross-examination of a State trooper, the prosecutor said:

> Cross-examination of Trooper Mitchell by [defense counsel], <u>and again it's the theme that they're trying to sell to you folks, and I don't say there's anything improper, but it's just not the truth.</u> Okay. And <u>this is like a big jigsaw puzzle. They want to start pulling pieces of the puzzle to the point that you can't see the picture.</u> . . .

> [(Emphasis added).]

White's counsel objected and, at sidebar, argued the prosecutor was denigrating the defense. The prosecutor denied this was the case. The judge ruled that the State was entitled to respond to the defense counsel's arguments and view of the facts, although she cautioned the prosecutor to avoid any personal references. Defense counsel requested no further instruction to the jury.

Without naming defense counsel, and without further objection, the prosecutor continued:

> As I was saying . . . the trial is very similar to a giant jigsaw puzzle. If somebody starts pulling the pieces of the puzzle out and you can't see the face anymore, <u>what I'd like to do with you over the next hour is put those pieces back so you can see the fact that clearly spells guilt as to both defendants.</u>

> [(Emphasis added).]

Thereafter, the prosecutor made the following remarks:

> Let's talk about Marcus White's conduct, not what his lawyers say, oh, he didn't touch her. His conduct governs here, folks, and his conduct tells you he became part of this as much as the other three. And [the judge is] going to tell you in the law — this is why the

> law is so important — that a conspirator, a person who joins in on an illegal crime can join in. They don't have to be there at the beginning. They can join in at some later point in time. You're going to hear that from [the judge]. It's one sentence out of probably a 50 page charge but that is so pertinent to Marcus White because again he made that decision to join and he joined them with that purpose and he's equally responsible. <u>That is the law, not the law that they want to have you believe.</u>
>
> [(Emphasis added).]

There was no objection.

Later, the prosecutor addressed the attacks on Harrison's credibility, suggesting that, contrary to defense counsel's argument that the case rose or fell on the credibility of the State's cooperating witnesses, other evidence proved defendants' guilt.

> When [defense counsel] — and again he does nothing wrong by this. I'm not suggesting there's anything improper. It is in an effort to focus you away from their clients. <u>They have to focus the attention on somebody who's an easy target. Kareem Harrison is no match for skilled lawyers, highly trained lawyers</u> . . . .
>
> [(Emphasis added).]

Counsel for White objected, and the judge indicated she would provide appropriate instructions at the end of the prosecutor's summation. When the prosecutor finished, over defense counsel's continued objection, the judge told the jury

> There were some comments made in the State's closing about the skillful lawyers and that they're no match for these skillful lawyers, and I want to make sure that you understand that there's nothing wrong with having a skillful lawyer and it's entirely inappropriate if that were to be interpreted as anything improper which I know [the prosecutor] did go out of his way to say there's nothing improper about it, but I want you to hear that from me, too, that all of these lawyers deserve respect and that they're doing their jobs and they're doing it well, and that's a good thing and that's the way that the system should work. So I want to make sure you understand that. And I'm sure [the prosecutor] did not mean anything by it but I think it is also helpful for you to hear that from the Court.

The court also cautioned the jury to disregard any comments by counsel expressing personal beliefs. In her final jury instructions, the judge reiterated that the arguments of counsel were not evidence.

Defendants contend these comments and other comments by the prosecutor denigrated the defense and defense counsel. Our courts have sternly warned prosecutors that it is improper to "cast unjustified aspersions on defense counsel or the defense." State v. Lazo, 209 N.J. 9, 29 (2012) (citing Frost, supra, 158 N.J. at 86). While the prosecutor's comments tread perilously close to the line, we cannot conclude they require a new trial.

Initially, there were no objections to many of the comments, which indicates defense counsel "perceived no prejudice." Smith,

supra, 212 N.J. at 407 (citing State v. Timmendequas, 161 N.J. 515, 576 (1999), cert. denied, 534 U.S. 858, 122 S. Ct. 136, 151 L. Ed. 2d 89 (2001)).  Some comments were pointed rebuttals to the defense summations, in particular, White's claim of mere presence at the scene, and Willis's assertion that Harrison, a willing participant in the crimes, was unbelievable.  Lastly, the judge gave a strong curative instruction when the prosecutor finished, which she reiterated in her final instructions, and we presume the jury understood and followed those instructions.  Id. at 409.

V.

We address the remaining points raised by White before turning to the sentencing arguments made by both defendants.  White argues the prosecutor's summation comments, together with the judge's instructions, "distorted" the law of co-conspirator liability, confusing the jury and permitting it to find White guilty of the underlying robbery, carjacking and felony-murder counts if it found him guilty of conspiracy.  We disagree.

The State contended White was a willing co-conspirator with Laurance, Willis and Harrison and therefore "legally accountable" for their conduct.  See N.J.S.A. 2C:2-6(b)(4).  To the extent White contends the prosecutor's opening statement or summation misled the jury as to the applicable law, the argument lacks sufficient merit to warrant discussion.  R. 2:11-3(e)(2).  The

summation as a whole did not leave the jury with a mistaken impression of the law, and the judge made clear that she, not the attorneys, was responsible for providing instructions on applicable legal standards.

During the charge conference, White objected to the inclusion of any language defining the substantive offense of conspiracy because the indictment contained no conspiracy count. The judge disagreed, noting she was required to tailor Model Jury Charge (Criminal), "Conspiracy — Vicarious Liability (N.J.S.A. 2C:2-6b(4))" (Oct. 17, 1988), to the facts of the case. She did so by including portions of Model Jury Charge (Criminal), "Conspiracy (N.J.S.A. 2C:5-2)" (April 12, 2010). See State v. Mance, 300 N.J. Super. 37, 63-64 (App. Div. 1997) (holding trial court had "unquestionable" authority to provide the jury with an instruction on conspiracy where State's theory of liability was premised on N.J.S.A. 2C:2-6(b)(4)). Defense counsel expressed her continuing objection, but stated she was not challenging the judge's proposed language. The judge provided a written copy of her instructions to the jury before it began deliberations.

During deliberations, the jury sent out a note asking for "further guidance or explanation to co-conspirators and legally accountable in laymen's terms." The judge indicated she could not paraphrase the instructions already provided, but, if the jury

could identify with specificity which part was troublesome, she would try to provide further guidance. The jury never did.

White argues the instructions as given permitted the jury to find him guilty of conspiracy, not the substantive crimes underlying the felony murder convictions. We acknowledge that when the State seeks a felony murder conviction based on legal accountability for the predicate crime as a co-conspirator, a jury finding of guilt only as to conspiracy to commit the crime, pursuant to N.J.S.A. 2C:5-2, will not suffice. State v. Grey, 147 N.J. 4, 15-16 (1996). Rather, the felony murder conviction must rest on the jury's finding of guilt for the substantive offense, pursuant to N.J.S.A. 2C:2-6. Ibid.

However, the judge's instructions were clear. The jury was never asked to determine if White was guilty of conspiracy. The judge repeatedly told the jurors that they could not convict White of any felony murder count unless they also found him guilty of the underlying substantive crime. The jury apparently carefully considered the evidence as to White and his involvement in the underlying crimes because it acquitted him of the kidnapping, the State having acknowledged he was not present when the victim was abducted. In short, we cannot conclude the judge's instructions led to an "ultimate determination of guilt or innocence . . .

based on speculation, misunderstanding, or confusion." State v. Olivio, 123 N.J. 550, 568 (1991).

White also contends our decision in Gonzalez compels reversal. He argues that the judge's use of the phrase "and/or" during the jury charge on co-conspirator liability was plain error. R. 2:10-2. While we do not condone the continued use of this long-disfavored language, which is all too prevalent in our Model Jury Charges as written, we do not believe it was plain error under the particular facts of this case.

In Gonzalez, supra, 444 N.J. Super. at 71, the panel criticized jury instructions that made frequent use of the imprecise "phrase 'and/or.'" In that case, the defendant testified that he was at the scene of the fatal shooting with two co-defendants, but that "his participation was the product of duress." Id. at 73. The panel cited extensively to the jury instructions which repeatedly used "and/or" in describing two different crimes in the context of accomplice and coconspirator liability. Id. at 73-75. The panel found plain error, concluding

> [t]he instructions were inherently ambiguous because the judge failed to explain in clear English what the jurors were required to decide and, as a result, generated numerous ways in which the jury could have convicted without a shared vision of what defendant did, or convicted defendant on some charges without finding all the elements were proven beyond a reasonable doubt.

[<u>Id.</u> at 77 (citation omitted) (citing <u>State</u>
<u>v. Gentry</u>, 183 <u>N.J.</u> 30, 32 (2005)).]

In this case, the judge frequently used "and/or" in describing the substantive crimes for which the State argued White was legally accountable as a co-conspirator of Laurance "and/or" Harrison. However, she also told the jury that in order to find White guilty, it must find beyond a reasonable doubt that White conspired to commit "the same crime" as his co-conspirator, and the jury needed to consider each crime "individually" and "separately." The judge repeated the felony murder instructions three times, in each instance making clear which underlying predicate crime was implicated. The jury verdict form specifically directed the jury to return separate verdicts as to each crime, which it did, acquitting White of kidnapping and other charges.

Moreover, while the evidence made clear that White was not with the others when the victim was initially abducted, Harrison's testimony, and indeed White's own statement, placed him in the stolen car with the others after a certain point in time and essentially up until the stop in South Carolina. Under the circumstances, the jury could not be confused about who White was alleged to have conspired with and for whose conduct he was, the State contended, legally accountable.

24                                                    A-5598-12T4

White also contends the judge improperly admitted evidence of other uncharged crimes in violation of N.J.R.E. 404(b). The judge held a pre-trial hearing to determine the admissibility of testimony regarding White's and Laurance's possession of handguns on August 30, 2009, and their attempts to recover them after Williams and Thomas discarded them along the New Jersey Turnpike. The evidence revealed that defendants needed a car in order to return to the area to search for the guns. That led them to carjack the victim's car.

The judge applied the standards set forth in State v. Cofield, 127 N.J. 328, 338 (1992), and ruled this testimony was admissible to show White's motive, intent, a plan or scheme, and absence of mistake with respect to the events of September 2, 2009. After the jury heard this evidence, the judge issued an appropriate limiting instruction, which she repeated in her final charge.

The decision to admit or exclude evidence of other crimes or wrongs rests with the trial court's sound discretion and will only be reversed upon an abuse of that discretion. State v. Gillispie, 208 N.J. 59, 84 (2011). In particular, "[a] wide range of motive evidence is generally permitted, and even where prejudicial, its admission has been allowed in recognition that it may have 'extremely high probative value.'" State v. Rose, 206 N.J. 141,

165 (2011) (quoting State v. Long, 173 N.J. 138, 164-65 (2002)). We find no reason to disturb the judge's decision.

For the first time, White also argues it was error to admit evidence that he purchased and smoked marijuana while riding in the stolen car and while the victim was still alive, and that he threatened to kill Laurance later that evening. There was no objection at trial, and the admission of this very limited testimony does not raise a reasonable doubt that it led the jury to a verdict it otherwise would not have reached. State v. Ross, ___ N.J. ___, ___ (2017) (slip op. at 31) (quoting State v. Williams, 168 N.J. 323, 336 (2001)).

White also argues the judge should have granted his motion for acquittal made at the end of the State's case, and his post-verdict motion for a new trial as against the weight of the evidence. The arguments lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2). It suffices to say White's own statement was highly incriminating, there was evidence he used some of the victim's money to purchase marijuana, he was aware Laurance was going to kill the victim and he willingly went to South Carolina, knowing that Laurance intended to take the stolen car to a "chop shop."

Willis contends his sentence was excessive because the judge erroneously applied aggravating sentencing factors.  See N.J.S.A. 2C:44-1(a).  White makes a similar argument and contends the judge imposed consecutive sentences without performing a proper analysis under State v. Yarbough, 100 N.J. 627 (1985), cert. denied, 475 U.S. 1014, 106 S. Ct. 1193, 89 L. Ed. 2d 308 (1986).

We begin by noting, "[a]ppellate review of the length of a sentence is limited."  State v. Miller, 205 N.J. 109, 127 (2011).  As the Court has frequently reiterated:

> The appellate court must affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [State v. Fuentes, 217 N.J. 57, 70 (2014) (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

Furthermore, "trial judges have discretion to decide if sentences should run concurrently or consecutively."  Miller, supra, 205 N.J. at 128.  "When a sentencing court properly evaluates the Yarbough factors[3] in light of the record, the court's decision

---

[3] The Yarbough factors are:

will not normally be disturbed on appeal."  <u>Miller</u>, <u>supra</u>, 205 <u>N.J.</u> at 129.

---

> (1) there can be no free crimes in a system for which the punishment shall fit the crime;
> (2) the reasons for imposing either a consecutive or concurrent sentence should be separately stated in the sentencing decision;
> (3) some reasons to be considered by the sentencing court should include facts relating to the crimes, including whether or not:
>> (a) the crimes and their objectives were predominantly independent of each other;
>> (b) the crimes involved separate acts of violence or threats of violence;
>> (c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;
>> (d) any of the crimes involved multiple victims;
>> (e) the convictions for which the sentences are to be imposed are numerous;
> (4) there should be no double counting of aggravating factors;
> (5) successive terms for the same offense should not ordinarily be equal to the punishment for the first offense[.]
>
> [<u>Yarbough</u>, <u>supra</u>, 100 <u>N.J.</u> at 643-44.]

A sixth factor, imposing an overall outer limit on consecutive sentences, was superseded by legislative action.  <u>State v. Eisenman</u>, 153 <u>N.J.</u> 462, 478 (1998).

A-5598-12T4

The judge sentenced both defendants on the same day. She sentenced White first and found the following aggravating factors, to which she accorded great weight: the nature and circumstances of the offense; the gravity and seriousness of the harm inflicted on the victim including whether the defendant knew that the victim was incapable of resistance; the risk of re-offense; the need for deterrence; and defendant used or possessed a stolen motor vehicle while in the course of committing the crime including the immediate flight therefrom. See N.J.S.A. 2C:44-1(a)(1), (2), (3), (9) and (13)). The judge found no mitigating factors. See N.J.S.A. 2C:44-1(b). In sentencing White, the judge found the same aggravating sentencing factors and no mitigating factors.

Both defendants argue that, in finding aggravating factors one, two and thirteen, the judge "double counted" facts that established elements of the crimes for which they were being sentenced. See Fuentes, supra, 217 N.J. at 74-75. We disagree.

"In appropriate cases, a sentencing court may justify the application of aggravating factor one, without double-counting, by reference to the extraordinary brutality involved in an offense." Id. at 75 (citing State v. O'Donnell, 117 N.J. 210, 217 (1989)). The judge did that in this case when she sentenced each defendant.

In applying aggravating factor two as to each defendant, the judge emphasized that the victim was beaten and held captive in her own car for an extended period of time before she was shot and killed. The evidence revealed she repeatedly pled for her life. In State v. Soto, 340 N.J. Super. 47, 72 (App. Div.), certif. denied, 170 N.J. 209 (2001), we recognized that "the brutal circumstances surrounding the victim's suffering," fully justified the finding of aggravating factor two.

Factor thirteen, the use of a stolen car, an essential element of carjacking, "could not also represent an aggravating factor in sentencing for that offense." State v. Henry, 323 N.J. Super. 157, 165 (App. Div. 1999). However, the judge noted defendants were in possession of the victim's stolen car during the commission of the other crimes, including robbery, kidnapping and felony murder. In other words, this aggravating factor applied to the court's consideration of the sentence imposed on crimes other than carjacking. See State v. Boyer, 221 N.J. Super. 387, 405-06 (App. Div. 1987) (holding that when the court is sentencing for a group of charges, inherent elements of one charge can be used as aggravating factors for another), certif. denied, 110 N.J. 299 (1988).

Lastly, we find no mistaken exercise of discretion in imposing a consecutive sentence on White's conviction for the unlawful

possession of a handgun.  The judge carefully weighed the <u>Yarbough</u> factors and described in detail her reasoning.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION